**Lee A. Greenwood**
**David Zetlin-Jones**
**Heather L. Shaffer**
**Ming Ming Yang**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0978 (Zetlin-Jones)**
**ZetlinJonesJ@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | <u>**COMPLAINT**</u> |
| Plaintiff, | **25 Civ. 6713 (    )** |
| -against- | |
| **RYAN R. WEAR,  WATER STATION MANAGEMENT LLC, and CREATIVE TECHNOLOGIES, INC.,** | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| **REFRESHING USA, LLC, and IDEAL PROPERTY INVESTMENTS LLC,** | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Ryan R. Wear ("Wear"), Water Station Management LLC ("Water Station") and

Creative Technologies, Inc. ("Creative") (collectively, "Defendants") and Relief Defendants

Refreshing USA, LLC ("Refreshing") and Ideal Property Investments LLC ("Ideal") (together,

"Relief Defendants"), alleges as follows:

**SUMMARY**

1.      From at least September 2016 through February 2024 (the "Relevant Period"),
Defendants raised at least $275 million through the fraudulent offering and sale of securities backed
by water vending machines ("water machines").  Wear founded and controlled the companies that
purportedly manufactured and serviced the machines:  Creative and Water Station, respectively.

2.      Wear effected his fraud by orchestrating two inter-related Ponzi-like schemes,
through which Defendants misappropriated or otherwise diverted tens of millions of dollars in
investment proceeds to pay distributions to earlier investors and to fund Wear's unrelated business
ventures.

3.      Beginning by at least September 2016, Defendants' first scheme (the "Retail
Scheme") involved offering and selling investment contracts primarily to retail investors including
veterans.  As part of this scheme, Defendants solicited investors to purchase specifically identified
water machines from Creative, documented in a purchase order.  Water Station agreed to service the
investors' machines pursuant to an agreement executed at the same time as the purchase order.
Defendants lured investors by touting the prospect and, in some cases, the supposed guarantee, of
lucrative returns, typically ranging between at least 12% and 20% annually.  These returns were
ostensibly generated from the water machines' vending revenues, as derived from Water Station's
placement and maintenance of the machines in various retail locations.  From approximately
September 2016 to September 2023, the Retail Scheme raised in excess of $165 million through the
putative sale of more than 15,000 water machines to approximately 250 investors.

4.      But in reality, most of the more-than 15,000 water machines Defendants purported
to sell to investors either did not exist or were previously pledged to other investors.  Defendants'
representations to investors that they would earn steady returns from the revenues their machines
generated were also false.  Instead, Wear misappropriated his victims' investments to fund unrelated

businesses, including Refreshing and Ideal, and diverted them to make payments to earlier investors in a Ponzi-like manner.

5.      In approximately April 2022, as Defendants struggled to raise new investor money to sustain the Retail Scheme, Defendants commenced their second scheme (the "Note Scheme"), which targeted institutional investors.  Pursuant to the Note Scheme, Water Station raised more than $110 million between April 2022 and February 2024 through the issuance of notes purportedly secured by Defendants' water machines ("Notes").  Water Station procured these investments based on Wear's false representation that Water Station would use proceeds of the Notes exclusively to purchase new water machines from Creative and existing water machines from Retail Scheme investors, which would generate revenues to pay the Note Scheme investors their promised interest.

6.      As with the Retail Scheme, most of the water machines Water Station purported to pledge as collateral for the Notes did not exist or were not owned by Water Station.  In furtherance of the Note Scheme, Wear directed the submission of fabricated invoices, purchase orders, and other financial reports to the trustee bank for the Notes to support the illusion that Water Station was acquiring or had acquired more than 10,000 water machines to secure the Notes, and to deceive the trustee bank into releasing the Notes proceeds to fund those purchases.  In fact, Defendants misappropriated or otherwise diverted approximately $60 million from the Notes proceeds for unauthorized purposes, including to fund Refreshing and Ideal, to make payments to Retail Scheme investors, and even to pay Note Scheme investors their required interest payments with their own money.

7.      In approximately mid-2023, Defendants' scam began to come to light when a financial firm tasked with independently monitoring the performance of the water machines purportedly backing the Notes identified significant discrepancies between the water machines Wear claimed were securing the Notes and the water machines actually generating revenues in the field.

Wear was unable to explain these discrepancies, leading one Water Station insider (and early Retail Scheme investor) to conclude that Wear was running "the largest franchise fraud in the history of the United States."

8.      By mid-2024, Defendants had run out of money to sustain their fraud, and, in August 2024, Water Station and Creative were placed into receivership and involuntary bankruptcy proceedings, resulting in Wear's removal from his position as managing partner at both companies. To date, most Retail Scheme and Note Scheme investor victims have not recovered their investments.

## VIOLATIONS

9.      By virtue of the foregoing conduct and as alleged further herein: (a) Defendants Wear, Water Station, and Creative violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (b) Defendant Wear, as a control person of Water Station and Creative under Exchange Act Section 20(a) [15 U.S.C. §78t(a)], is liable for Water Station's and Creative's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

10.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) ordering Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (e) permanently prohibiting Wear from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (f) permanently enjoining Wear from, directly or indirectly (including, but not limited to, through any entity owned or controlled by Wear) participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Wear from purchasing or selling securities for his own personal account; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

14.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Among other things, Defendants offered and sold securities purportedly backed by water machines to Note Scheme investors whose principal place of business was in New York County, and who executed the relevant transaction documents to acquire the Water Station Notes in this District.

## DEFENDANTS

16.    **Wear**, age 49, is a resident of Marysville, Washington. Wear is the founder and owner and, until August 2024, was the managing partner of Water Station, Creative, Refreshing, and Ideal. Wear also owns and controls dozens of other limited liability companies.

17.    **Water Station** is a Washington limited liability company formed by Wear in 2016 and wholly-owned and controlled by him throughout the Relevant Period. Water Station placed, installed, operated, and serviced water machines, which were generally manufactured or sourced by Creative. In August 2024, Water Station was put into receivership through a private litigation in Washington state court, captioned *First Fed Bank v. Creative Technologies, LLC,* Case No. 24-2-10753-3 SEA (Wa. Super. Ct.) (filed May 14, 2024) (the "Receivership Action"). Later that month, a creditor of Water Station filed an involuntary Chapter 11 bankruptcy petition against it, captioned *Water Station Management LLC*, No. 24-bk-1864 (Bankr. E.D. Wa.) (filed Aug. 27, 2024) (transferred from Bankr. S.D. Tex.). Water Station is now managed by an independent chief restructuring officer, who also manages Creative and Refreshing.

18.    **Creative** is a Washington limited liability company formed by Wear in 2013. Throughout the Relevant Period, Creative was controlled and majority-owned by Wear. Creative manufactured, sourced, and sold water machines that Water Station placed and serviced around the country. In May 2024, Creative was put into receivership through the Receivership Action. In

August 2024, a creditor filed an involuntary Chapter 11 bankruptcy petition against Creative, captioned *Creative Technologies, LLC*, No. 24-bk-1866 (Bankr. E.D. Wa.) (filed Aug. 27, 2024) (transferred from Bankr. S. D. Tex.).  Creative is now managed by an independent chief restructuring officer.

**RELIEF DEFENDANTS**

19.     **Refreshing** is a Washington limited liability company formed by Wear in 2020. Throughout the Relevant Period, Refreshing was controlled and majority-owned by Wear. Refreshing, through its subsidiaries, operated retail vending machines that sold refreshments and snacks.  Refreshing was put into receivership through the Receivership Action in August 2024. Later the same month, a creditor filed an involuntary Chapter 11 bankruptcy against Refreshing, captioned *Refreshing USA, LLC*, No. 24-bk-1863 (Bankr. E.D. Wash.) (filed Aug. 27, 2024) (transferred from Bankr. S.D. Tex.).  Refreshing is now managed by an independent chief restructuring officer.

20.     **Ideal** is a Washington limited liability company formed by Wear in 2019. Throughout the Relevant Period, Ideal was majority-owned and controlled by Wear.  Ideal owned commercial and residential real estate across the United States, including warehouses in which water machines and vending machines were purportedly stored.  In the spring of 2024, Ideal was put into receivership through a private litigation in *First Fed Bank v. Ideal Property Investments*, No. 24-2-08418-5 (Wa. Super Ct.) (filed Apr. 14, 2024).  In September 2024, Ideal commenced Chapter 11 bankruptcy proceedings captioned *Ideal Property Investments LLC*, No. 24-bk-1421 (Bankr. E.D. Wa.) (filed Sept. 5, 2024).  Ideal is now managed by an independent chief restructuring officer.

**FACTS**

I.    **WEAR FORMS CREATIVE AND WATER STATION TO DEVELOP AND MONETIZE WATER MACHINES.**

    A.    **Background on Wear's Water Machine Business Model**

21.    Wear formed Creative in 2013 to develop, manufacture, and sell water machines. Creative's water machines filtered water from a local source, allowing customers to purchase gallon-size containers of filtered water using cash or a credit card.

22.    Wear formed Water Station in 2016 to place, install, service, and operate Creative's water machines. Water Station identified and facilitated the placement of Creative's water machines at available retail locations around the United States. Water Station was also responsible for installing and servicing the water machines, including the periodic replacement of the machines' water filters and the collection of cash and other payments from the machines.

23.    Water Station contracted with retailers for the right to install Creative-manufactured water machines in their stores.

24.    In exchange, Water Station paid the retailer a percentage of the water machines' revenues as a commission.

25.    Wear negotiated these contracts with retailers, including determining the locations for the water machines' placement and the retailers' commission levels, which generally ranged from 40% to 55% of the machines' gross profits.

26.    Wear signed the contracts with retailers on Water Station's behalf.

27.    Retailers that agreed to place water machines on Water Station's behalf included national convenience and grocery store chains, fitness centers, gas stations, and discount retailers. These retailers agreed to place Water Station water machines at locations across the United States.

28.     Each water machine purportedly had a unique serial number and modem number. The modem number would report the amount of credit card revenue generated by the machine, which was processed by a third-party vendor and sent to bank accounts belonging to Water Station.

29.     Wear had signatory authority for all Water Station and Creative bank accounts at all times throughout the Relevant Period.

## II.    THE RETAIL SCHEME

### A.    Defendants Offered and Sold Investment Contracts.

30.     By at least 2016, Wear began raising money for Water Station and Creative from retail investors through the issuance of investment contracts tied to Creative's water machines.

31.     Under these investment contracts—the precise terms of which, as described below, evolved over time—investors paid a fixed price, typically $8,500 per machine though sometimes as much as $10,000, purportedly to purchase water machines.

32.     In addition, investors paid service fees to Water Station to place, install, manage, and service the water machines.  Water Station deducted these service fees from the machines' purported monthly revenues that it paid to the investors.

33.     Investors also agreed to pay certain other expenses associated with the placement and service of the water machines in retail locations out of their machines' purported monthly revenues, including a share of the commissions Water Station paid to retailers for hosting their machines and the cost of replacing water filters for their machines.

34.     Under the investment contracts, investors were supposed to receive monthly payments from Water Station that came from the net profits of their water machines, after fees and expenses.

35.     These profits were to be derived from Water Station's efforts to place, service, and manage the water machines in locations across its retailer network.

        **1.**      **Defendants Marketed the Water Machine Investments as Securities.**

36.     Water Station and Creative, through Wear, retained in-house salespeople on commission to solicit investments in their water machine investment opportunities.

37.     Beginning at least in 2019, Wear also engaged third-party marketing firms to solicit investments in Water Station's and Creative's water machines, generally agreeing to pay these firms a commission of 10% of every dollar they raised for Water Station and Creative.

38.     Defendants pitched their water machine investment opportunities as a purely passive investment, offering steady income derived solely from Water Station's servicing and management efforts.  According to Defendants' marketing materials, investors would own the machines and collect regular streams of income as Water Station placed and serviced the machines, purportedly in highly-trafficked retail locations, and collected payments from water sales.

39.     In brochures and other marketing materials provided to potential investors, Defendants described the water machine investment as a "truly passive, turnkey investment" that was "ideal for the passive investor," offering potential investors the opportunity to "maintain current activities without the responsibilities to carry out the day-to-day operations of the business."

40.     Defendants' marketing materials also touted the water machine investment as tax advantageous, permitting for immediate deductions and depreciation of the machines that supposedly enhanced the return on the investment.

41.     In some cases, the marketing materials provided to prospective investors guaranteed that Water Station would buy back the water machines from investors at or near their purchase price upon the election of the investor, offering investors additional protection against the investment's downside risks.

42.     When soliciting potential investors, Defendants specifically targeted the veteran community, coordinating with veterans' business advocacy groups to publicize the opportunity.

43.    Defendants offered veterans preferred terms of investment, including lower minimum investments and down payments, higher guaranteed returns, and exclusive financing options, such as low or no-interest loans provided by Creative repayable over ten years.

44.    Defendants also encouraged prospective investors to finance their investments through debt. Wear applied for and obtained a listing with the Small Business Administration's ("SBA") Franchise Directory, a listing of all franchises and other brands eligible for SBA financial assistance. This listing publicly confirmed the eligibility of investments in Water Station and Creative's water machines for SBA loans.

45.    To assist investors in accessing SBA financing, Wear offered investors the option of executing a "franchise agreement" with a Water Station affiliate, WST Franchise Systems LLC ("WST"), under which WST licensed its business model and trademark to investors for a fee.

46.    A franchise agreement was not required for an investment in Defendants' water machines, and not all Retail Scheme investors signed one. Investors who executed franchise agreements typically did so to obtain eligibility for an SBA loan to finance the investment, as the provisions governing SBA loans available to finance Water Station investments generally prohibited loans for securities purchases, but allowed loans for "franchise" opportunities.

47.    At least 127 investors obtained approximately $102 million in SBA loans to finance their investments in the Retail Scheme.

48.    Regardless of whether investors executed a franchise agreement, the substance of their investment in the Retail Scheme was the same: investors purchased water machines from Creative in bulk and delegated placement and management of them to Water Station in exchange for a return based on a share of the machines' profits

### 2.    The "Partnership Model" (2016 – 2021)

49.    From 2016 through late 2021, Water Station and Creative raised money from Retail Scheme investors using a "joint venture," or "franchise" model (together, the "partnership model"), through which investors executed: (a) a purchase order; (b) a service agreement; and, for franchise investors, (c) a franchise agreement.

50.    **The Purchase Order:**  Pursuant to the purchase order, investors agreed to pay Creative a fixed price (usually $8,500 per machine, though sometimes as much as $10,000) to become the "sole owner and titleholder" of specific machines identified in the purchase order by their unique serial numbers.

51.    The purchase orders did not give investors discretion over the locations of their water machines, which was generally left to Water Station's discretion.

52.    Wear signed all purchase orders on behalf of Creative.

53.    **The Service Agreement:**  Investors executed a service and management agreement ("service agreement") with Water Station at the same time they entered into an order to purchase water machines from Creative.  Pursuant to the service agreements, Water Station agreed to place and install investors' machines at retail locations, to collect cash and credit card payments from the machines, and to manage "all day-to-day decisions" concerning the purchased machines in return for a servicing fee typically equal to 20% of the applicable machines' monthly profits.

54.    Until approximately mid-2019, the service agreements provided that investors and Water Station would split the net profits generated by the investors' water machines equally, after Water Station collected its 20% servicing fee and paid out other expenses (which included certain commissions paid to retailers to place the machines).

55.    Beginning in or around mid-2019, Water Station amended the terms of its service agreements to eliminate the profit-splitting structure for new, and for many existing, Retail Scheme

investors.  Instead, Water Station guaranteed investors fixed annual returns, which generally ranged from 12% to 20% of their investment.

56.     Water Station also generally promised investors in these service agreements a share (typically 30%) of any advertising revenues the company received from placing advertisements on the investors' water machines.

57.     Although early versions of the service agreement provided for payments to investors based on the profits of their particular machines, all versions of the service agreement informed investors that Water Station would not segregate water machine revenues by machine, but rather would commingle machine revenues with the revenues generated by other investors' machines.

58.     Additionally, although the service agreements stated that Water Station was "not required to maintain separate bank accounts [for] or to otherwise segregate" the water machine owners' gross and net machine profits, the service agreements represented that Water Station would maintain all books and records relating to the water machines and, at least annually, provide investors with a report showing their particular machines' gross and net profits, associated costs, as well as the total distributions Water Station paid them.

59.     The service agreements additionally gave Water Station the option (and, in some cases, the obligation, at the investor's election) to buy the water machines back from investors at 85% of the cost of the machines within the first three years of the investment, and at 100% of the cost of the machines thereafter.

60.     Wear signed all service agreements on behalf of Water Station.

61.     **The Franchise Agreement:**  Certain investors—*i.e.* those who financed their water machine investments through an SBA loan—also executed a franchise agreement with WST, under which WST licensed its business model and trademark to investors for a fee.   Investors who did not need or want an SBA loan to finance their investment generally did not execute the franchise

agreement or pay the franchise fee, but instead invested in water machines by executing the purchase order and service agreement only.

62.     Wear signed all franchise agreements on behalf of WST.

63.     At or after the time investors executed the purchase order and service agreement, either Creative or Water Station, through Wear, provided them with lists of the machines that they purchased and owned, identifying each machine by its unique serial number and confirming the location at which each machine was installed ("Machine Lists").  Wear and Creative typically appended Machine Lists to investors' purchase orders, although Water Station (through Wear) would sometimes send investors Machine Lists after execution of the purchase orders to update investors on the placement of their machines.

### 3.     The Private Placement Model (Late 2021 – 2023)

64.     In or around August 2021, Wear concluded that the purchase orders and service agreements, collectively, constituted an investment contract and therefore fell within the definition of "securities" under the federal securities laws.

65.     Defendants accordingly began selling the water machine investments pursuant to a private placement memorandum ("PPM") that purported to rely on exemptions from registration under Regulation D (the "private placement model").

66.     Beginning in at least January 2022, Defendants, as well as a registered broker-dealer they later retained to market the investments, distributed the PPM to prospective investors along with marketing materials and the purchase orders and service agreements.

67.     The PPM described the "security" being sold as an "Investment Contract" comprised of the purchase order and service agreement, the terms of which remained materially the same as those used previously under the partnership model with Retail Scheme investors.

68.     The PPM represented that investors would receive a monthly fee based on a fixed annual rate of return specified in the service agreement (generally between 12% and 15% of the investment) plus a percentage (generally 30%) of any advertising revenue generated by the investors' water machines.

69.     The PPM stated that "return[s] on the purchase of an Investment Contract will depend solely on the sales of water from each water [machine] the Investor purchases, and on the net advertising revenue attributable to each machine."

70.     The PPM also stated that the offering proceeds would be used to finance the manufacture of the water machines sold under the investment contract, to pay broker fees if applicable, and to provide a return to Creative's owners.

71.     Wear reviewed and approved the PPM on behalf of Water Station and authorized its use with potential investors.

72.     Investors in the private placement model subscribed by executing a subscription agreement, in addition to signing the purchase order and service agreement.

73.     Apart from the PPM's acknowledgment that the purchase order and service agreement constituted a security and the requirement that investors sign a subscription agreement, investing in water machines under the private placement model was functionally the same as under the partnership model.

74.     As with investors under the partnership model, investors under the private placement model (a) purchased water machines from Creative, (b) delegated the machines' placement and maintenance to Water Station, (c) received Machine Lists from Water Station and Wear identifying the serial number and location for each machine they supposedly purchased, and (d) received monthly fees purportedly derived from the management efforts of Water Station.

75.     Wear signed all subscription agreements (as well as purchase orders and service agreements) on behalf of Water Station and Creative under the private placement model.

76.     From 2016 through April 2022, Defendants raised over $135 million from approximately 250 Retail Scheme investors under either the partnership model or the private placement model.[1]

77.     In so doing, Defendants purported to sell more than 15,000 water machines to investors.  Defendants represented in purchase orders and Machine Lists that they had placed these machines at locations in Defendants' retailer network on these investors' behalf.

**B.      Defendants Defrauded Investors in the Retail Scheme.**

78.     In fact, Defendants neither produced nor installed anywhere near 15,000 water machines.  The vast majority of the water machines Defendants purported to sell and manage did not exist at all or were not owned by Creative because they had already been sold to other investors.

79.     Indeed, during the Relevant Period, Water Station placed, at most, approximately 2,600 machines at retail locations nationwide, only a fraction of the more than 15,000 water machines Defendants represented to investors that they had installed and placed in falsified purchase orders and Machine Lists.

80.     Defendants stored approximately 3,000 additional water machines in warehouses, but many of these machines were only partially built or otherwise inoperable—and, in any event, virtually none of these warehoused machines were either (a) located where Defendants represented them in purchase orders and/or Machine Lists to be, or (b) capable of producing revenues to generate investor distributions as promised.

---

[1]     Defendants raised the nearly the entirety of those investments through the partnership model.  As of April 2022, only three investors signed subscription agreements, and Water station raised only approximately $3 million of funds from investors through the private placement model.

81.    Accordingly, Wear's and Creative's representations in the purchase orders that investors would be the sole owners of actual, physical machines placed in the field were, in at least most cases, false and misleading.

82.    In addition to falsely overstating the number of water machines they sold, Defendants misrepresented the machines' locations. For example, according to Machine Lists that Defendants sent to investors during the Relevant Period, Defendants represented that Water Station had placed more than 3,800 investor water machines at nationwide locations of Retailer A, a national discount retail chain.

83.    These representations were false because, in fact, Retailer A hosted no more than 120 of Defendants' water machines during the Relevant Period.

84.    Defendants also routinely sold the same water machines to multiple investors. For example, Water Station (through Wear) provided a Machine List to an investor ("Investor A") in April 2022 identifying by serial number the 71 machines this investor purportedly owned under a purchase order executed in December 2021. All but one of the serial numbers on Investor A's Machine List also appeared on the Machine List that Defendants sent to a different investor ("Investor B"), who purportedly purchased these water machines months earlier, in April 2021, and who never sold or otherwise relinquished title to them.

85.    Accordingly, the representations in Investor A's purchase order that Investor A would have sole title to the purchased water machines were false.

86.    In total, during the Relevant Period, Defendants sold at least 650 water machines bearing a unique serial number to more than one investor. Dozens of machine serial numbers were assigned to at least four investors at once.

87.    As the founder, owner, and managing partner of Water Station and Creative, Wear (a) signed the purchase order and service agreement through which each Retail Scheme investor

invested in Defendants' water machines; (b) had access to these entities' vending management systems, which showed the number of machines actually placed and installed; (c) negotiated the placement of machines (and commission rates) with retail locations hosting Defendants' machines; and (d) generated, reviewed, and/or disseminated (or facilitated the dissemination of) the Machine Lists for each investor.

88.    Accordingly, Wear knew or recklessly disregarded that Creative was falsely promising Retail Scheme investors exclusive ownership of water machines that, in reality, were either non-existent or were already owned by others (or both), and which were not placed at the locations Defendants represented them to be.

89.    After inducing investments through the false representation of ownership of actual, physical water machines, Wear misappropriated the investment proceeds, including to fund the operations of his unrelated ventures—diverting tens of millions of dollars' worth of investor funds to Refreshing, Ideal, as well as other businesses Wear founded and managed in other industries.

90.    Wear also used approximately $800,000 in investor funds to purchase a personal residence on Camino Island in Washington in July 2020.

91.    At least partly because Defendants promised returns on more water machines than they actually placed, Water Station was unable to generate enough machine revenues to cover Water Station's guaranteed monthly distributions to investors.

92.    To cover these shortfalls—and to foster the pretense that investors possessed real, physical, and profitable water machines when they did not—Wear made putative distribution payments to Water Station's investors using other sources, including using new investor money to make payments to existing investors in a Ponzi-like fashion.  For example:

a.  In July 2020, three investors wired approximately $300,000 in new investments to a Creative bank account. At Wear's direction, almost a third of that money was transferred to pay outstanding investor distributions the same day.

b.  Between August 21 and August 24, 2020, Wear directed the transfer of new investor funds received over that period to pay over $90,000 in investor distributions.

c.  In January 2022, Wear caused approximately $1 million in putative distributions to be paid to Retail Scheme investors using the proceeds of a loan obtained by Creative.

d.  On March 3, 2022, Creative received $340,000 in new investor money. Wear routed that money to existing Retail Scheme investors to pay distributions and to fund Wear's unrelated businesses within two days of receiving it.

93.  Wear directed these (and other) transfers to make payments to investors, and he therefore knew or recklessly disregarded that he was using new investor money and other sources to make payments to investors, and not money generated from water machine profits as represented.

94.  Even after it became clear, by at least the middle of 2020, that water machine profits were insufficient to cover investor distributions, and after he had resorted to covering shortfalls through other means, Wear continued to represent to later investors in service agreements and the PPM that their distributions would be paid using machine profits.

## III.  THE NOTE SCHEME

### A.  Defendants Offered and Sold Water Station Notes to Institutional Investors.

95.  By April 2022, Defendants faced significant cash flow shortages, lacking funds from either new investors or other sources to satisfy their distribution obligations to Retail Scheme investors.

96.  To prolong his scheme, Wear arranged for Water Station to issue Notes to institutional investors.

97.     On April 29, 2022, at Wear's direction, Water Station issued Class A Notes in the aggregate principal amount of $56.25 million and Class B Notes in the aggregate principal amount of $15 million under an indenture ("Indenture"), raising a total of approximately $71.25 million.

98.     A financial services company focused on community banking ("Institutional Investor A") purchased the Class A Notes for $55.7 million.

99.     The Class B Notes were purchased by two affiliates of the Jefferies Financial Group ("Jefferies"), including the 3|5|2 Capital ABS Master Fund, LP ("352 Fund"), a private investment fund.

100.    Jordan Chirico ("Chirico"), the portfolio manager for the 352 Fund, directed the purchases of the Class B Notes, with the 352 Fund paying approximately $8.9 million, and another Jefferies affiliate buying the remainder for approximately $6.1 million.

101.    Wear signed the Indenture on behalf of Water Station.

102.    In exchange for the Notes proceeds, Water Station pledged 2,794 water machines as collateral ("Initial Collateral").  Water Station, at Wear's direction, provided a list of the 2,794 water machines pledged as Initial Collateral to a bank appointed to serve as trustee (the "Trustee") under the Indenture, identifying each machine by serial number and location (the "Initial Collateral List").

103.    Going forward, Water Station also agreed under the Indenture to pledge "Eligible Assets," defined as newly manufactured water machines or existing machines less than five years old, to be purchased with the proceeds of the Notes.  These Eligible Assets then became part of the collateral pool securing the Notes.

104.    Wear represented in the Indenture that Water Station "ha[d] good and marketable title" to the Initial Collateral and Eligible Assets pledged under the Indenture, and that when transferred to the noteholders, the collateral would be "free and clear of any Encumbrances."

105.    Pursuant to the Indenture, Water Station granted a first priority security interest in the Initial Collateral and all Eligible Assets to the Trustee for the benefit of noteholders.

       1.    **The Indenture's Restrictions on Defendants' Use of Notes Proceeds**

106.    The Indenture placed strict controls over the use of proceeds from the Water Station Notes offerings and water machine revenues.

107.    Under the Indenture, Notes proceeds were to be remitted into a segregated account with the Trustee (the "Acquisition Account").

108.    With limited exceptions applicable to the initial funding, Water Station was prohibited from withdrawing funds from the Acquisition Account for any purpose other than to acquire water machines defined as Eligible Assets.[2]

109.    To assure that Water Station was using Notes proceeds only for their approved uses, before Water Station could make a withdrawal from the Acquisition Account, it was required to submit certain required documentation to the Trustee.

110.    The required documentation included:

    a.    An **invoice** from Creative evidencing the purchase of new water machines identified by serial number;

    b.    A **purchase and sale agreement** between Water Station and Creative (signed by Wear on behalf of both parties) in which Creative represented it had title to the water machines subject to the sale free and clear of any encumbrances and/or transfer restrictions and that the water machines sold were in good operating condition and repair.  Bills of sale attached to the purchase and sale agreement

---

[2]    As part of the initial funding, Water Station was authorized to use a portion of the Notes proceeds to pay certain offering-related expenses, to buy back machines from certain retail investors to contribute to the Initial Collateral, and to make certain one-time lease payments on warehouses leased from Ideal that were purportedly used to store water machines.  After payment of these expenses, the remainder (approximately $38 million) was remitted into the Acquisition Account for the acquisition of Eligible Assets.

identified the machines sold to Water Station by serial number and placement location; and

    c.    A **withdrawal request** from Water Station (also typically signed by Wear) in which Water Station certified that it would use the Notes proceeds "solely to fund the purchase of Eligible Assets" pursuant to the terms of the Indenture and related purchase and sale agreements.

111.    These documents were subject to review by the "Collateral Manager," an independent financial institution appointed under an agreement that was executed contemporaneously with the Indenture and signed by Wear on behalf of Water Station.

112.    The Collateral Manager was required to review and approve each proposed acquisition of Eligible Assets by Water Station before the Trustee could release funds from the Acquisition Account.

113.    The Indenture imposed additional reporting obligations on Water Station, requiring it to provide the Collateral Manager and Trustee with monthly sales data for all water machines securing the Notes, quarterly performance reports, and periodic financial statements.

    **2.**    **The Indenture's Restrictions on the Use of Water Machine Revenues**

114.    The Indenture required that revenues from the water machines pledged to the Notes as Initial Collateral or Eligible Assets be remitted to a separate segregated account at the Trustee (the "Collection Account").

115.    The Indenture authorized Water Station to withdraw funds monthly from the Collection Account to pay commissions to retailers, which typically ranged from 40% to 55% of the revenues generated by the water machines purportedly placed at their stores.

116.     Each month, Water Station was required to submit to the Collateral Manager a report detailing the revenues earned by the water machines serving as collateral for the Notes and the commissions Water Station owed to the retailers where those machines were placed.

117.     Upon review and approval of this report, the Collateral Manager would, per the Indenture, instruct the Trustee to transfer the amounts owed as commissions from the Collection Account to a Water Station bank account from which Water Station was to then distribute the commissions it owed to retailers.

118.     Under the Indenture, balances from the Collection Account, net of retailer commission payments, were used to compensate the Trustee and Collateral Manager and to make interest and principal payments to noteholders.

**B.     Defendants Defrauded Investors in the Note Scheme.**

**1.     Defendants Fraudulently Misappropriated and Diverted Notes Proceeds from the Acquisition Account.**

119.     Defendants induced investments in the Notes on fraudulent pretenses and misappropriated millions of dollars of Notes proceeds through numerous deceptions and false representations.

120.     The Initial Collateral List identifying the water machines that Wear, on behalf of Water Station purported to have pledged to secure the Notes contained hundreds of machines that did not exist, that were already owned by Retail Scheme investors, and/or were not in the locations identified.

121.     Water Station's representation in the Indenture that Water Station had "good and marketable title" to the water machines included on the Initial Collateral List—and that such assets were "free and clear" of any encumbrances—was therefore false.

122.     Wear's and Water Station's representation in the Indenture that they would use Notes proceeds exclusively to acquire Eligible Assets—that is, water machines—was also false.

123.    For example, on May 19, 2022, just three weeks after the first Notes offering closed, Wear submitted Water Station's very first withdrawal request to the Trustee, seeking approximately $480,000 from the Acquisition Account.

124.    Wear represented to the Trustee in the request that "the funds so withdrawn will be used solely to fund the purchase of Eligible Assets," and attached an invoice and purchase and sale agreement that supposedly identified by serial number the 58 new water machines to be acquired with the requested funds.

125.    This representation was false.

126.    As Wear acknowledged in an email to Water Station's financial controller on May 20, 2022, Water Station needed "all of the bond draw for partner payments."  In other words, Water Station needed all of the Notes proceeds he was withdrawing for payments to Retail Scheme investors.

127.    Consistent with this email, and contrary to his representation to the Trustee, Wear used the approximately $480,000 from the Acquisition Account to pay distributions to investors in the Retail Scheme and not to purchase new water machines as required.

128.    Additionally, the invoice and purchase and sale agreement attached to Wear's May 19, 2022, withdrawal request were fabricated, representing water machine sales that never, in fact, occurred.

129.    Wear's subsequent requests to withdraw funds from the Acquisition Account followed a similar pattern.

130.    From May 2022 through November 2022, Water Station, through Wear, submitted nineteen withdrawal notices to the Trustee, each representing that the funds withdrawn would be used "solely" to fund the purchase of Eligible Assets.  In aggregate, these requests, and their supporting invoices and purchase and sale agreements, purported to evidence that Water Station had

used the Notes proceeds to acquire more than 4,000 new water machines from Creative, and to buy back more than 750 machines from investors in the Retail Scheme, which Water Station then pledged to the Trustee as collateral for the Notes.

131.    By the end of November 2022, Water Station had fully drawn down the approximately $38 million initial funding of the Acquisition Account under the Indenture.

132.    On January 23, 2023, Water Station issued approximately $25 million of additional Class A and B Notes under a supplemental Indenture (the "First Supplemental Indenture"), bringing the total amounts raised through the Notes offering to nearly $100 million.

133.    The Notes issued under the First Supplemental Indenture were subject to the same restrictions and reporting requirements the initial Indenture placed upon Water Station's withdrawals of both the Notes proceeds from the Acquisition Account and retail commission payments from the Collection Account.  As with the initial Indenture, Water Station could only use Notes proceeds to purchase Eligible Assets, and Water Station represented that it had "good and marketable title" to any Eligible Assets it pledged under the Indenture and that when transferred to the noteholders, such collateral would be "free and clear of any Encumbrances."

134.    Between February 2 and April 25, 2023, Water Station, through Wear, submitted six withdrawal notices to the Trustee, each representing that the funds withdrawn would be used "solely" to fund the purchase of Eligible Assets.  These notices and their supporting documentation purported to evidence that Water Station had used the Notes proceeds to acquire an additional approximately 2,850 new water machines from Creative as Eligible Assets that Water Station then pledged to the Trustee.

135.    By April 2023, Water Station had fully withdrawn the Notes proceeds raised under the First Supplemental Indenture.

136.    In total, by April 2023, under the Indenture and First Supplemental Indenture, Water Station withdrew approximately $63.6 million in Notes proceeds from the Acquisition Account, and purported to pledge 10,464 water machines (including the Initial Collateral) to the Trustee as collateral to secure the Notes.

137.    The 10,464 water machines that Water Station supposedly acquired and installed at retailers and to have pledged as security for the Notes exceeded the number of machines that Creative had ever manufactured, much less placed in the field.

138.    In actuality, most of the water machines Wear and Water Station claimed to have purchased with Notes proceeds either did not exist or had already been sold to Retail Scheme investors (and were not repurchased using these Notes proceeds).

139.    Wear's representations in the withdrawal requests described in paragraphs 130 and 134 that the withdrawn funds would be used solely to fund the purchase of Eligible Assets were, accordingly, false.

140.    At Wear's direction, Water Station fabricated the invoices and purchase and sale agreements that it submitted with these withdrawal requests to reflect sales from Creative to Water Station of fictitious water machines and/or water machines that Creative did not own.

141.    Wear and Water Station also routinely generated and submitted falsified financial reports, including sales and performance reports, to the Collateral Manager and the Trustee.

142.    These reports falsely vouched for the existence of non-existent water machines, falsified the locations at which these machines were purportedly installed and placed, and fabricated the revenues that these machines generated.

143.    For example, at Wear's direction, Water Station represented to the Collateral Manager in withdrawal requests and in sales and performance reports that, as of April 2023, Water Station had placed 3,367 of the 10,464 water machines supposedly securing the Notes with Retailer

A, a retailer that (as detailed above) had in fact hosted no more than 120 machines across its stores during the Relevant Period.

144.    Water Station also represented in these reports that, as of April 2023, Water Station had placed an additional 4,099 machines across three other retailers (Retailers B, C, and D), none of which hosted a single Water Station water machine at any location during the Relevant Period.

145.    In total, Wear reported in invoices, purchase sales and sales agreements, and other sales data and performance reports, that Water Station had placed at least 70% of the water machines purportedly securing the Notes with retailers that, in actuality, had no (or only nominal) business with Water Sation, as reflected in the below chart:

| Retailer | Eligible Assets Reportedly Placed at Retailer | Eligible Assets Actually Placed at Retailer |
|---|---|---|
| Retailer A | 3,367 | 112 |
| Retailer B | 442 | 0 |
| Retailer C | 718 | 0 |
| Retailer D | 2,939 | 0 |
| **Total** | **7,466 (out of 10,464 machines)** | **112** |

146.    Contrary to Wear and Water Station's representations that Water Station would use funds withdrawn from the Acquisition Account solely to buy water machines, Wear and Water Station then misappropriated and diverted these funds unauthorized purposes.

147.    Of the $63.6 million Water Station withdrew from the Acquisition Account between May 2022 and April 2023, Defendants misappropriated and siphoned more than $59 million for purposes other than purchasing water machines—including using (a) more than $15 million to pay distributions to Retail Scheme investors; (b) more than $10 million to fund the operations of Wear's other businesses, including Refreshing and Ideal; and (c) approximately $5 million to fund the Collection Account in order to cover interest payments due to the same holders of the Notes whose investments had funded the Acquisition Account.

### 2. Defendants Fraudulently Misappropriated and Diverted Notes Proceeds from the Collection Account.

148.    At Wear's direction, Water Station routinely provided revenue reports to the Collateral Manager that materially overstated the amount of revenues generated by the water machines Water Station had actually placed at retail locations.

149.    In turn, because retailer commissions were based on a percentage of this reported revenue, these inflated revenue figures had the effect of falsely inflating the amount of commissions Wear reported being required to pay to retailers.

150.    Providing inflated revenue and commission figures to the Collateral Manager and Trustee allowed Wear to access funds from the Collection Account that, based on the actual, lower commission totals, he would not have been able to access.

151.    For example, Wear approved the submission of sales reports and other data to the Collateral Manager representing that, between May 2022 and December 2023, the more-than 3,200 machines purportedly placed at Retailer A had generated approximately $6.5 million in customer revenues over the period, resulting in corresponding commission payments due to Retailer A of about $3.15 million.

152.    Upon review and approval of the Collateral Manager, the Trustee disbursed this $3.15 million from the Collection Account to a Water Station bank account to allow Water Station to make its claimed commission payments to Retailer A.

153.    But, as reflected in Water Station's internal sales and commission reports, over the May 2022 to December 2023 period, Water Station only actually placed about 112 water machines at Retailer A stores, and those machines generated only about $150,000 in customer revenues.

154.    The commissions Water Station actually paid to Retailer A between May 2022 and December 2023 totaled only about $60,000.

155. Wear misappropriated and diverted the difference between the $3.15 million in commission amounts he falsely told the Collateral Manager and Trustee he paid Retailer A and the $60,000 he actually paid Retailer A in commissions.

156. By similarly overstating the purported commissions paid to other retailers, Defendants were able to misappropriate or otherwise divert a total of at least $5 million from the Collection Account during the Relevant Period.

> **3.** **Defendants Made Deposits into the Collection Account to Conceal Their Fraud.**

157. Had Defendants deposited only actual water machine revenues into the Collection Account, the resulting deficit would have exposed the falsity of the invoices, purchase and sale agreements and collateral reports Defendants had been submitting to the Collateral Manager and Trustee.

158. To avoid detection of their fraud and to maintain the illusion that the thousands of fictitious water machines Defendants claimed to have placed were real, Wear directed funds into the Collection Account from other sources to create the appearance that these fictitious machines were generating revenue.

159. For example, Wear directed funds into the Collection Account from: (a) new investments in the Retail Scheme (including Investor C, described below at paragraphs 161 to 172), (b) revenues from other types of vending machines (*i.e.*, not water machines) owned by Refreshing; and (c) funds that Wear misappropriated from the Acquisition Account.

160. In sales reports provided to the Collateral Manager, Wear falsely classified these other sources of funds as water machine revenues, bolstering the fiction that the Notes were collateralized with thousands of revenue-generating water machines in the field when, in reality, both the number of the machines and the revenues they generated were substantially overstated.

## IV.    DEFENDANTS FRAUDULENTLY INDUCED AN INVESTMENT FROM INVESTOR C.

161.    Defendants' successful closing of the first Notes offering in April 2022 allowed Wear to present Water Station and Creative as well-capitalized and positioned for growth, enabling Wear to generate additional demand from investors and to recruit new victims for the Retail Scheme.

162.    In November 2022, between Water Station's first and second Notes issuances, Defendants secured its largest ever investment in the Retail Scheme by inducing Investor C, a private company focused on investing in water-related businesses, to enter into a purchase and sale agreement for water machines to be serviced and managed by Water Station.

163.    Pursuant to a November 2022 master purchase agreement, and several supplemental purchase and sale agreements executed through January 2023, Investor C invested $32.2 million in Water Station.

164.    In exchange for that investment, Water Station purported to sell Investor C 3,427 water machines, which Water Station allegedly had acquired from existing investors in the Retail Scheme who purportedly had agreed to sell their water machines back to Water Station.

165.    Under a corresponding service agreement, Water Station agreed to place, manage, and service Investor C's water machines.  The service agreement promised Investor C a fixed annualized return of 12%.

166.    Wear signed each of the purchase and sale agreements and the service agreements related to the sales of water machines to Investor C.

167.    In these agreements, Wear identified by serial number and location each of the water machines Water Station purportedly purchased from investors in the Retail Scheme on Investor C's behalf.

168.    Wear also represented in these agreements that the water machines Water Station purchased on Investor C's behalf were in good and operable condition, and that Investor C would have exclusive title to them.

169.    These representations were false.

170.    Wear did not, as represented, enter into agreements to buy back over 3,000 water machines from existing investors in the Retail Scheme on Water Station's behalf for resale to Investor C.  Rather, at Wear's direction, Water Station provided Investor C a list of water machines that did not exist and/or were pledged or sold to other investors.

171.    As Wear knew or recklessly disregarded by virtue of his role as signatory to the Indenture, Indenture supplements, and withdrawal requests pledging water machines as collateral to the Trustee, at least 2,000 of the water machines that Defendants purported to sell to Investor C had already been pledged as collateral to the Note Scheme, including approximately 600 machines that were purportedly placed at Retailer A but did not actually exist.

172.    Rather than use Investor C's $32.2 million to acquire water machines from existing investors as promised, Wear directed that at least $13.7 million of the investment be routed to bank accounts belonging to Defendants to (a) pay outstanding distributions to earlier investors in the Retail Scheme; (b) fund the Collection Account to create the false appearance that the Eligible Assets were generating revenue in-line with what Defendants' fabricated collateral reports had represented; and (c) make payments on commercial loans related to Wear's other, unrelated business interests.

## V.     RELIEF DEFENDANTS WERE UNJUSTLY ENRICHED.

173.     During the Relevant Period and throughout the period in which their fraudulent Retail and Note Schemes were ongoing, Defendants paid more than $47 million to Refreshing ($41.5 million) and Ideal ($6.2 million).

174.     Refreshing did not provide consideration justifying its receipt of this $41.5 million.

175.     Ideal did not provide consideration justifying its receipt of this $6.2 million.

## VI.     DEFENDANTS' FRAUDULENT SCHEMES UNRAVEL.

176.     By April 2023, with no new investments coming in, and having completely exhausted both the initial proceeds from the Note Scheme and the funding from Investor C, Defendants stopped making guaranteed monthly distributions to investors in the Retail Scheme.

177.     Over the summer of 2023, the Collateral Manager began to question the accuracy of the data reported by Water Station in its invoices, purchase and sale agreements, and sales and performance reports.

178.     In or around August 2023, the Collateral Manager commissioned a third-party to perform spot checks of locations that Water Station had represented to have placed water machines that were supposedly collateralizing the Notes.

179.     This third-party firm reported to the Collateral Manager that 163 of the 164 locations it visited had no Water Station water machines on site.

180.     The Collateral Manager, in turn, relayed this finding to Wear by email on August 11, 2023 and sought an explanation for the discrepancy.

181.     On August 16, 2023, the Collateral Manager informed Wear by email that Water Station had 90 days (a "Cure Period") per the terms of the Indenture to provide information

verifying the existence and the location of "3000+ machines" ostensibly securing the Notes that the Collateral Manager determined were "actually missing."[3]

182.    The Cure Period expired in November 2023 without Wear providing sufficient information to substantiate the existence of the machines the Collateral Manager identified.  During this period, Wear also cut off the Collateral Manager's access to Water Station's vending management system, preventing the Collateral Manager from viewing real-time evidence of Water Station's purported water machine operations and performance.

183.    In December 2023, the 352 Fund (and a Jefferies affiliate) bought out the Class A Notes held by Institutional Investor A at a discount, leaving the 352 Fund as the primary holder of all classes of the Notes.

184.    Also in December 2023, after months of not receiving its guaranteed distribution payments, Investor C filed an arbitration claim against Defendants and other Wear entities, alleging, among other things, that the water machines Investor C purportedly purchased were not free and clear of prior liens and claims, were not present at the locations they had represented them to be, and may not have existed at all.

185.    Over the course of the end of 2023 and into 2024, numerous other victims of the Retail Scheme initiated lawsuits against Defendants due to their failure to make promised distribution payments, with many of these suits accusing Wear of operating a Ponzi scheme.

186.    In January 2024, Chirico requested that Water Station's director of equipment services provide him directly with a report from Water Station's vending management system listing all operable water machines placed in retailer locations.  The report showed that Water Station had

---

[3]    Under the Indenture, if any water machines securing the Notes were discovered to require maintenance or repairs (*i.e.* were non-operational), Water Station had 90 days to demonstrate that it had performed all necessary repairs, or else would be required to refund to the Collections Account all cash used to purchase such machines.

only 2,342 machines placed in the field at retailer locations, far less than the more than 10,000
machines purportedly securing the Notes that Water Station had reported through its Initial
Collateral List, invoices, and purchase and sale agreements.

187.    On January 29, 2024, Wear participated in a recorded call with Chirico and
Individual A, a mutual friend of Chirico and Wear's who had extensive business dealings with Wear
and Water Station, including as one of Water Station's earliest partnership model investors.

188.    During the call, Chirico asked Wear if a substantial portion of the collateral for the
Notes were actually vending machines, rather than water machines.  Individual A raised the
possibility that a large portion of the water machines did not exist at all.

189.    Wear did not deny the allegations and provided no explanation as to the existence or
the whereabouts of the missing water machines.  Wear acknowledged that he did not know where
the relevant water machines were and suggested instead that he would look for alternative funding
sources to repay Water Station's investors.

190.    On the call, Individual A accused Wear of running "the largest franchise fraud in the
history of the United States."

191.    The 352 Fund and Water Station entered into another supplemental Indenture on
February 2, 2024, under which Water Station sold the 352 Fund an additional approximately $16.7
million worth of Notes, bringing the total raised through Water Station's note offering to
approximately $111 million.

192.    In May and June, 2024, the Trustee issued notices of default to Water Station under
the Indenture.

193.    In May 2024, Creative was placed into receivership through the Receivership Action.

194.    In August 2024, the order appointing the receiver in the Receivership Action was
amended to place Water Station (as well as Refreshing) into the receivership, at which time Wear

was removed from his role as managing partner of Water Station and Creative and divested of any management authority with respect to them.

195.    In August 2024, creditors filed involuntary Chapter 11 bankruptcy proceedings against Water Station and Creative.

196.    In April 2025, counsel for the estates of Water Station and Creative in their pending bankruptcy proceeding filed a preliminary accounting listing water machines placed in retail locations as of October 2024, the last date for which Water Station's and Creative's vending management system had data.

197.    That list reported that only 2,107 water machines had been placed in retail locations as of October 2024.  Many of the machines included on the list were claimed by multiple creditors because Defendants frequently sold the same machine to more than one investor.

198.    Counsel to Creative's and Water Station's estate in bankruptcy additionally identified approximately 2,700 water machines inventoried in warehouses across various states—many of which were only partially built or otherwise inoperable, and many of which likewise were claimed by multiple creditors.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

199.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 198.

200.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material

fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

201.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

202.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 198.

203.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

204.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Control Person Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(Wear)**

205.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 198.

206.     As alleged above, Water Station and Creative violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

207.     At all relevant times, Wear controlled Water Station and Creative and was a culpable participant in Water Station and Creative's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

208.     By reason of the foregoing, Wear is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Water Station's and Creative's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Relief Defendants)**

209.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 198.

210.     As described above in Paragraphs 173 to 175, Refreshing and Ideal received approximately $41.5 million and $6.2 million, respectively, in investor proceeds raised through the Retail and Note Schemes.

211.     Relief Defendants have no legitimate claim to these ill-gotten gains.

212.     Relief Defendants obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds.

213.     Relief Defendants have therefore been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and

all persons in active concert or participation with any of them from violating, directly or indirectly,

Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with

pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act

Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3];

**IV.**

Ordering Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains by

which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and

21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**V.**

Permanently prohibiting Wear from serving as an officer or director of any company that

has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is

required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## VI.

Permanently enjoining Wear from, directly or indirectly (including, but not limited to, through any entity owned or controlled by Wear) participating in the issuance, purchase, offer or sale of any security, provided, however, that such injunction shall not prevent Wear from purchasing or selling securities for his own personal account; and

## VII.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
        August 14, 2025

_/s/ David Zetlin-Jones_

Lee A. Greenwood
David Zetlin-Jones
Heather L. Shaffer
Ming Ming Yang
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0978 (Zetlin-Jones)
ZetlinJonesJ@sec.gov